CASE 51—PETITION EQUITY—DECEMBER 1.

# Urey's Adm'r v. Urey's Ex'x, &c.

APPEAL FROM CALDWELL CIRCUIT COURT.

WILLS—CONSTRUCTION OF DEVISE—COSTS.—A testator, after making certain special devises to his collateral kindred, provided: " I clearly will and declare that my wife shall have all my property to do with as she pleases, as this is only intended in case we should die while gone," he and his wife being about to start on a journey. He named his wife as executrix, and gave her power to destroy this will if she should choose to do so. After the return of the testator he added a codicil to his will, making additional devises, and making changes in the devises made by the original will. This codicil the testator declares to be a part and parcel of his will. The wife of the testator survived him. In this action, brought by the widow for a construction of the will, *Held*—

1. If the first paper executed by the testator was invalidated by the return of himself and wife, it was republished by the codicil subsequently added, and both are to be construed together as one will.

2. It was the intention of the testator that the special devises made by the will and codicil should take effect only in the event his wife did not survive him, and that she should have the entire estate absolutely in the event she did survive him. The intention of the testator, as gathered from the whole will, must govern.

Urey's Adm'r v. Urey's Ex'x, &c.

3. This action having been brought by the widow for a construction of the will to enable her to sell a part of the estate, and the various claimants under the will having filed answers and asked affirmative relief, it was error to require the widow to pay their attorney's fees.

WM. MARBLE FOR APPELLANT.

1. A will wholly contingent may be made absolute and operative by a properly executed codicil. (Beal v. Cunningham, 3 B. M., 390; 76 Am. Dec., 699; Redfield on Wills, vol. 1, p. 273.)
2. Judgment of a county court admitting a will to probate can only be questioned by appeal to the circuit court. (Abbott v. Taylor, 11 Bush, 337; Hughey v. Sidwell's Heirs, 18 B. M., 260.).
3. The plain and unambiguous provisions of a will must prevail over doubtful or ambiguous provisions. (2 Jarman on Wills, page 57; 3 Jarman on Wills, p. 706; 6 Vesey, 129; 1 Redfield on Wills, 356-57, 429-30, 433-34, 446-48 and 450-51; Barksdale v. White, 28 Gratt., 224; Thornhill v. Hall, 8 Bligh, 88; Moobery v. Maege, 2 Munf., 453; Rayfield v. Gains, 17 Gratt., 1; Catlett v. Lawrence, 1 Vesey, Jr., 269; Blake v. Brenberry, 1 Vesey, Jr., p. 194; Jones v. Colbeck, 8 Vesey, p. 38.)
4. The intention of the testator as gathered from the whole will must govern. (1 Redfield on Wills, 432-4-5; Hawkinson on Construction of Wills, 1 & 2, 45 Am. Dec., 608.)
5. When it is necessary for the executor to apply to a court of equity for the construction of a will the cost, including attorney's fees, should be paid out of the estate. (Straw v. Societies, &c., 67 Maine, 495; Dean v. Home, &c., 111 Mass., 132; 2 Daniels' Chancery, 1503, 1506.)

C. T. ALLEN FOR UNKNOWN HEIRS.

1. A will purely contingent can not be revived and made absolute by the addition of a codicil added after the time for the happening of the contingency had expired. (Maxwell v. Maxwell, 3 Met., 109.)
2. When action is brought by an executor to obtain a construction of a will for the sole benefit of the executor, the costs should' not be paid out of the estate.

F. W. DARBY FOR APPELLEES.

1. Appending a codicil to a contingent will is a republication of the will. (3 B. M., 390; 76 Am. Dec., 699.)
2. Fees to attorneys for parties seeking affirmative relief should not be allowed out of the estate. (Williamson v. Williamson, 1 Met., 305.)

CHIEF JUSTICE PRYOR DELIVERED THE OPINION OF THE COURT.

F. W. Urey, born in Ireland but a naturalized citi-

zen of the United States, died in the town of Princeton,
where he had resided for many years, leaving a last
will and testament that was admitted to probate in the
Caldwell County Court, his wife, Pernecy Urey, quali-
fying as executrix. His death took place in July,
1864, and his widow, the executrix, took charge of
his estate, and now holds and claims it as her own
under certain provisions of the testator's will.

The testator left no children surviving him, but
brothers and sisters and their descendants ; his father
and mother having died long prior to his death. He
was the owner at his death of considerable estate, con-
sisting of land, bank stock, money, choses in action,
etc., all of which has been in the possession of his
widow since the probate of his will in August, 1865.

The judgment of the county court declaring the
paper in question to be the last will of Urey was never
appealed from, modified or reversed. His will consists
of an original paper dated the twenty-ninth of March,
1859, and a codicil attached thereto on the same paper
dated April 10th, 1860.

The will and codicil seem to have been executed in
the manner prescribed by the statute.

In the year 1884, the widow sold certain parcels of
the land devised to her, as she claims, by her husband,
and the purchasers questioning her title, this action
in equity was instituted in the court below seeking a
construction of the will, to which the heirs-at-law of
the testator, as well as the devisees, were made defend-
ants. The will is as follows :

" Knowing the uncertainty of life and certainty of
death, and being about to take a trip east, I think it

proper and right to dispose of what property a kind Providence hath blessed me with ; to this end I make this my last will and testament, to wit :

" 1st. I will and bequeath to my former negro woman named Phereby, now in Liberia, and her children, the dividend on my bank stock in the Farmers' Bank of Kentucky during the existence of said bank, and when the bank winds up, then my stock in said bank is to go to the said Phereby and her children.  But if my executors think best, they may reinvest it in some good bank stock, and the dividend therefrom to go to the said Phereby and her children forever, the dividend to be sent to Rev. Wm. McLain, Washington City, to be sent by him to them if they remain in Liberia, but should they return to the United States, then my executors are to send direct to them wherever they may reside.

" 2d. I will and positively direct that all my negroes at my wife's death, young and old, be free and sent to Liberia, and that they shall be well clothed and a sufficient quantity of clothing in addition be given them to last them two years after they get there, and that expenses required to send them to Liberia and clothing, etc., shall be paid out of my estate ; and I also will that each negro so sent shall have one hundred dollars each, to give them a start when they get there.

" 3d. It is my will that each of the negroes I have already sent to Liberia shall have one hundred dollars. This money is to be also sent to the Rev. Wm. McLain, Washington City, to be sent to them by him.

" 4th. I will and bequeath to Joseph Henry the land I intended for Jane Kirk, but as she is now dead, I give

it to Joseph Henry, and in lieu thereof I give to David Kirk, Alexander Kirk, and Nancy Kirk, five hundred dollars.

"5th. I will and bequeath to the session of the Presbyterian Church in Princeton, five hundred dollars, the interest of which is to go yearly, forever, towards keeping the church in repair, the principal not to be touched.

"6th. I will and bequeath to my beloved pastor, the Rev. James Hawthorne, five hundred dollars.

"7th. I will and bequeath to Joseph Henry, in addition to the land, one thousand dollars.

"8th. In case myself and wife should not live to return, I will that all mine, and my wife's clothing and silverware to be sent to Phereby and her children, wherever they may be, either in Liberia or in the United States; also, all the bedding.

"9th. I will and bequeath to Frances Harris and her children, my town property that I now live on.

"10th. I will that Niecy Perry shall have five hundred dollars, and that all the furniture and carpets be divided between Mrs. Mary Bond, Frances Harris and Niecy Perry, Mrs. Bond to make the division.

"11th. I will and bequeath to Jane Wallace, in Ohio, five hundred dollars.

"12th. It is my will that this will is not to take effect until my wife's death. But in case my wife wishes to destroy this will, she is at liberty to do so, and is at perfect liberty to dispose of any of my property as she pleases while she lives, except all my negroes are to be free and disposed of as stated above.

"I clearly will and declare that my wife shall have

:all my property to do with as she pleases, as this is only intended in case we should die while gone.

"Lastly. I appoint my beloved wife my sole executrix, and is to give no security in court; and in case neither myself nor wife should not live to return, in that event I appoint Dr. P. B. McGoodwin and Rev. James Hawthorne my executors, and positively forbid any person from preventing my negroes being free and sent to Liberia.

"Given under my hand and seal this the seventh day of March, 1859. The word 'have' interlined before signing.

F. W. UREY. [SEAL.]

"Witnesses:

"A. C. MAYES,

"T. D. PINNER."

"I make addition to the within will dated the seventh of March, 1859.

"I further will to my four nieces in Philadelphia, namely, Margaret Totton, Sally Bell, Salina Bell, and Pernecy McElhenny, five hundred dollars each. If Mr. McLain should die or go out of office, then the money to be sent to Phereby and her children, to be sent to the secretary of the Colonization Society, to be sent to them by him. I hereby revoke the five hundred dollars given to Pernecy Perry in the tenth clause in the within will. I give to Mary Garrett the note I hold on her father. I hereby will and declare that James Kevil nor his family is to have one cent of my property, in any way, as they have already got as much as I intend them to have. This codicil I declare to be

part and parcel of the within will.   Given under my hand and seal this tenth day of April, 1860.

"F.  W.  UREY.  [SEAL.]

"Witnesses :

"J. R. HARP,

"WILL. H. MILLER."

The heirs-at-law of the testator maintain that, as the effect or validity of the instrument as a will is made to depend on the contingency of both the testator and his wife dying while on their eastern trip, and both having returned, the writing became a nullity, and the whole estate descended to them as his next of kin, subject to the widow's dower and distributive share of the personalty.   The legatees insist that the paper is the last will of the decedent, and the widow took either a life estate, or became entitled to the residuum of the estate after the various devises or legacies have been satisfied. The widow claims the entire estate under the twelfth clause of the will.

Such are the different constructions placed on the will of the testator by the parties in interest, and if, as contended, the original will was based on a contingency that never happened, and can not be revived or made effectual by a codicil attached thereto, then the heirs-at-law take the property subject to the rights of the widow as doweress and distributee.

The probate of the will disposes of the question as to its validity, and it must be construed as the last will and testament of the decedent.

The will was admitted to probate by a court having jurisdiction of the subject-matter, in the county of the testator's residence, in the mode provided by the statute,

and if all the devises made in the paper of the twenty-ninth of March, 1859, were purely contingent and defeated by the non-happening of the event upon which the devises were to take effect, still the codicil written on the same paper of April 10th, 1860, is "*declared to be a part of the within will,*" and the paper as first executed, referred to by the codicil, is but a continuation of the devises made or intended to be made by the testator. The entire paper dated first in March, 1859, and that dated in April, 1860, is the true will of the testator, and both admitted to probate as required by the statute.

So the contingent devises were made absolute by the codicil that was executed after the testator and his wife returned from their trip east. A new will was in effect then made, and the provisions of the first writing changed in several respects. The provisions of a will may be wholly contingent, and the devise defeated by reason of the non-happening of the event, or never become effectual in contemplation of law ; and such were the devises made in the reported cases of Maxwell v. Maxwell, 3 Met., 109, and Dougherty v. Dougherty, 4 Met., 25. In the case of Beal v. Cunningham, 3 B. M., 390, it was held that a codicil properly executed and attached to or referring to a paper that had never been properly signed or attested as a will, would give effect to the entire paper as one will.

It is plain, therefore, that the paper dated in April, 1860, made the original paper a part of it, and the two together constituted the will of the testator, conceding that the devises first made were all contingent.

The will was written by the testator, and is so framed

as at first impression leaves the mind in doubt as to the character of the estate vested in the wife by its provisions; but when considering the objects of his bounty and the circumstances connected with its execution, the intention of the testator is made manifest, and the language used of no doubtful meaning. The testator and his wife had accumulated an estate ample to support them, and in the estimation of both was regarded as a small fortune. They were about to take a trip east, and the testator fearing that he might die, or that both himself and wife might never return alive, executed the paper dated in March, 1859. He made various special devises to his slaves, as well as those formerly emancipated; also devises to his relations, but made them all depend on the contingency of both himself and wife dying before their return to Princeton. The stock of the Farmers' Bank, amounting to ten thousand dollars, was the most valuable part of his estate, and the special devises to be paid out of his other property would leave to his wife of the residuum but a small remnant of his estate, scarcely sufficient for her support and maintenance. She was the principal object of his bounty, and no attempt was made, or intention expressed or implied in either paper, of depriving her of the absolute title to all of his estate in the event she survived him. His plain purpose was to emancipate his slaves regardless of the claims of his wife upon him, and by the paper first written he was selecting the objects of his bounty in the event his wife was not living when they returned to enjoy his property, but was careful to provide that in the event they returned, or his wife survived him, that she should have the entire estate. In the twelfth clause

of his will he says in express words, so as to leave no ambiguity in the language used, and to explain the provisions of the will or the language preceding this sentence: *I clearly will and declare that my wife shall have all my property, to do with as she pleases, as this is only intended in case we should die while gone.*

These special devises are not to take effect in the event my wife survives me, and contemplating the fact that this might happen, he makes his wife executrix of his will, with power to destroy it, and says she can dispose of the property while she lives as she pleases; and to indicate what he means by this power conferred on the wife, in the last sentence of the twelfth clause he vests in her the absolute estate, *and this he clearly wills and declares.*

It may well be argued that while the devises in the first paper to his slaves and collateral kindred were conditional, the devise to the wife was absolute and unqualified, yet he says " *this is only intended in case we should die while gone.*"

They did, however, both return, and if that fact invalidated the paper of the seventh of March, 1859, as is insisted by one of the counsel for appellants, the testator on the tenth of April, 1860, republished the first paper, by having written upon it as follows: "I make this addition to the within will dated 7th March, 1859. I further will to my four nieces (naming them) five hundred dollars each," and then proceeds to change certain provisions contained in the first paper. This addition made both papers the will of the decedent, executed on the tenth of April, 1860, in which we find

the entire estate, by the twelfth clause, disposed of by the testator to his wife, and in construing that clause with the other provisions of the will, it simply means that if my wife survives me she is to have the entire estate ; but if she does not, the property is to go to my slaves and next of kin, as provided by my will.

And this construction applies whether the devise to the wife was conditional or unconditional by the first instrument ; for it is evident that the addition of other legacies to his collateral kindred by the codicil was intended to be subordinate to the devise made to testator's wife, and placed on the same footing with the special devises made in the paper of March, 1859. While the last clause in a will must control, if repugnant to previous provisions made by the testator, still the intention of the testator must determine the construction ; and where there is a seeming inconsistency that can be reconciled, as in this case, in determining the intention of the testator from the entire will, the chancellor will not hesitate to adopt the construction that follows the intention of the testator.

In this will there is an absolute devise to the wife of all the estate, and special legacies given to collateral kindred, in the first instrument, made to depend on the wife dying before the testator. Of this there can be no doubt ; but after this instrument is prepared, the testator, keeping in mind the fact that he had already given to his wife the absolute estate, and provided for his collateral kindred in the event she could not take, he then proceeds to add to his will and to *further will* certain legacies to other collateral kindred, meaning, when looking to the entire instrument, that they were to take

in the same manner as his collateral kindred already provided for.

"The intention of the testator as expressed in the will, and as gathered from a legal construction of the whole will, including the codicil, and not from outside conjecture or ordinary intelligence, is to govern." (Redfield on Wills, volume 1, 432-33, 434, 435.)

An express or positive devise cannot be controlled by inference or argument from other parts of the will, but, on the contrary, general words will be controlled in order to make the whole consistent. (3 Jarman, 706.)

If a general devise, including the whole of the estate, be made, and then in other portions of the will specific dispositions, these are to be regarded as explanations or exceptions out of the general disposition, and it makes no difference which comes first. (1 Redfield, 445-46.)

With these rules before us, there would be but little difficulty in determining that the wife held the entire estate, subject to be charged with the payment of the specific legacies, whether created before or after the general devise, but for a contrary intention plainly manifested by the testator.

He gives to the wife power to destroy the will, and what his purpose was in inserting such a provision is not easily determined, unless the testator supposed that by its destruction she would become the sole owner. He then gives her the power to dispose of any of the property as she pleases, while she lives, except the negroes; and then, to make his intention the more certain and explicit, he clearly *wills and declares* that

*my wife shall have all my property to do with as she
pleases.* Such power is inconsistent with a purpose on
the part of the testator to give to his collateral kindred,
in either paper, these legacies, to be paid out of the gen-
eral estate, giving to the wife the residuum.

Nor can it be said, with such an absolute devise and
power given the wife, that she is to be confined to a
life estate only. In our opinion, she is the absolute
owner of the entire estate embraced by the provisions
of the will in question and now in controversy.

There is a remaining question to be disposed of,
arising on the cross-appeal of the widow. The court
below required the entire costs, including attorney's
fees for the defense, to be paid by the widow as ex-
ecutrix. This, in our opinion, was erroneous. The
widow, who was also executrix, had sold a portion of
her estate devised under the will of her husband, and
the purchasers refusing to comply with their contract,
it became necessary to have the will construed, as they
doubted her title. All parties interested were made
defendants, and each defendant, or class of defendants,
filed answers and asked affirmative relief. One class,
the heirs, insisted that the paper claimed to be a will
was a nullity. The negroes asked that the bank stock,
or its dividends, be paid over to them.

The widow had been in possession of this estate for
over twenty years, undisturbed by any of these parties;
and when the action was instituted, it became really an
action against the widow to recover the specific legacies.
Their claims were hostile and each had an attorney.
These attorneys must be paid by those employing
them; the parties to the litigation must pay their own
costs.

An attorney's fee should be allowed the attorney for the non-residents, for without his appointment the action could not have proceeded.  Neither the attorney for Mrs. Carlisle, or the attorney, for the administrator of Phereby and her children, are entitled to be paid out of the estate, and for the reason that the widow has been required to pay these fees the judgment is reversed on the cross-appeal, and affirmed on the original appeal.

The cause is remanded for proceedings consistent with this opinion.